Affirmed and Memorandum Opinion filed March 4, 2008








Affirmed and Memorandum Opinion filed March 4, 2008.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-06-00890-CR

NO. 14-06-00891-CR

____________

 

LEE W. SANSOM, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 177th
District Court

Harris County, Texas

Trial Court Cause Nos. 1048795
& 1048796

 



 

M E M O R A N D U M   O P I N I O N








Appellant, Lee W. Sansom, was indicted on the offenses of
indecency with a child by contact and aggravated sexual assault of a child. 
The jury returned a guilty verdict, and the trial court sentenced appellant to
four years= confinement on the indecency charge and ten years= confinement on
the sexual assault charge, with the sentences to be served concurrently in the
Texas Department of Criminal Justice, Institutional Division.  On appeal,
appellant challenges the trial judge=s limitation of
the scope of cross-examination of two prosecution witnesses, as well as the
trial judge=s failure to submit a reasonable doubt instruction on
extraneous offenses in the jury charge on punishment.  We affirm.

Factual
and Procedural Background

C.S. and J.A., the complainants, lived with their two older
sisters, their mother, Margarita Arcos (AArcos@), and appellant,
their stepfather.  In 1997, Arcos and appellant were married, and appellant
thereafter moved in with Arcos and her four daughters.  At that time, C.S. was
seven years old, and J.A. was five years old.  Their apartment had two
bedrooms:  the first, where Arcos, appellant, and J.A. slept,[1]
and the second, where C.S. and her older sisters slept.

At trial, the complainants testified that appellant=s sexual abuse
commenced in 1999, when C.S. was nine years old, and J.A. was seven years old. 
Both testified as to the charged offenses, as well as to offenses not alleged
in the respective indictments; the details of each are provided fully below. 

Disclosure
of Appellant=s Conduct

Neither C.S. nor J.A. themselves initially informed the
authorities of the sexual abuse.  Nor did they discuss the abuse with members
of their immediate family or each other, except for J.A.=s disclosure to
C.S. sometime in 1999.  C.S. testified that she told her cousin, Tatiana, of
appellant=s conduct in October 2005, shortly before being
baptized. Although C.S. asked her not to tell anyone that she had been molested
by appellant, Tatiana told her mother, Concepcion (Arcos=s sister-in-law),
who then informed Arcos of appellant=s conduct.  On
October 11, 2005, Concepcion and Arcos filed a police report, and C.S. and J.A.
were each interviewed by Ivee Syon (ASyon@) of the Children=s Assessment
Center (ACAC@) on October 20.








During their respective interviews, C.S. and J.A. detailed
the manner in which each had been sexually abused by appellant.  The interviews
were videotaped, and Syon herself was called to testify at trial as the outcry
witness.  Her trial testimony indicated that J.A. had initially been scheduled
for an interview by Syon only as a precaution: siblings of sexual abuse victims
are typically interviewed Ajust in case,@ and there had been
no indication that J.A. had been molested when her interview was initially
scheduled.  In fact, Syon testified that J.A. Adidn=t know how anyone
knew@ before her
disclosure of appellant=s inappropriate touching to Syon.

Legal
Proceedings

Officer Kim Barnes (ABarnes@) of the Houston
Police Department initially contacted appellant on October 26, 2005, and
informed him of the allegations made against him.  On January 11, 2006,
appellant was formally indicted on the charges of indecency with a child by
contact, and aggravated sexual assault of a child under fourteen years of age. 
Appellant pleaded not guilty, and the charges were consolidated for trial.  At
trial, the State elicited testimony from C.S. and J.A. regarding the incidents
of sexual abuse detailed below, several of which were not specifically alleged
in the charging instruments.  Appellant proffered the theory that C.S. and J.A.
had fabricated the charges against him, in retaliation for his seeking to
divorce Arcos, and in response to his being a strict disciplinarian.  However,
the trial judge prevented appellant from inquiring into Arcos=s citizenship
status on cross-examination, as well as alleged discipline problems with C.S.,
which, as appellant urges, form the basis of his defense, and which we address
more fully below.  At the close of the guilt/innocence phase, the jury received
a reasonable doubt instruction for the extraneous offenses, and found appellant
guilty on both counts.








During the punishment phase, appellant presented two
witnesses; the State presented one witness, and reoffered all the evidence from
the guilt/innocence phase of trial.  The charge instructed the jury that the
range of punishment was from two to twenty years on the indecency count, and
five years to life on the sexual assault count, both of which could be probated
if the jury desired.  The charge reminded the jury of the State=s burden of proof,
but it did not inform the jury that it could consider the extraneous offenses
only if it found beyond a reasonable doubt that appellant committed them. 
Appellant did not object to the failure of the charge to contain a reasonable
doubt instruction.  The jury assessed punishment at four years= imprisonment on
the indecency count, and ten years= imprisonment on
the sexual assault count, with the sentences to be served concurrently.

Issues
on Appeal

On appeal, appellant contends that the trial court erred in
(1) improperly limiting the scope of cross-examination of two prosecution
witnesses, the effect of which was to deny him the right to present a defense;
and (2) not submitting a reasonable doubt instruction on extraneous offenses in
the jury charge on punishment.

Analysis
of Appellant=s Issues

I.        Improper
Limitation of Cross-Examination

In his first issue, appellant contends that the trial court
violated his Sixth Amendment rights when it improperly limited the scope of his
cross-examination of two prosecution witnesses, Arcos and C.S.  The trial court
refused to allow appellant to cross-examine Arcos about whether she was a
citizen of the United States, and refused to allow cross-examination of C.S.
regarding specific instances of her misconduct and related discipline
problems.  Appellant argues that, by limiting the scope of his
cross-examination of each, the trial court Aindividually
shield[ed] them from any effective cross-examination as to their possible
motives for fabrication,@ which resulted in Athe complete
evisceration of his defense,@ and the Adenial of a fair
trial@ to appellant.  We
disagree.

A.      Appellant
Preserved Error on the Issue








As a preliminary matter, the State contends that appellant
failed to preserve error on this issue.  However, we disagree.  When a trial
court denies the defendant the opportunity to question a witness for the State
in the presence of the jury about an entire subject matter that might have
shown the witness lacked credibility, such as malice, ill will, motive, or
bias, error is preserved when defense counsel states the subjects on which he
intends to question the witness. Ho v. State, 171 S.W.3d 295, 304 (Tex.
App.CHouston [14th
Dist.] 2005, pet. ref=d) (quoting Stults v. State, 23
S.W.3d 198, 204 (Tex. App.CHouston [14th Dist.] 2000, pet. ref=d)).  Here,
appellant sought to cross-examine Arcos regarding her citizenship status in
order to establish a possible motive for C.S. and J.A. to fabricate their
claims against him.  Similarly, appellant sought to cross-examine C.S.
regarding alleged discipline problems that Arcos and appellant had with her in
order to further explain C.S.=s motive to fabricate.  The record
reflects that appellant clearly stated the subject matter on which he intended
to question each witness.  Therefore, appellant has preserved this issue for
review.

B.      Standard
of Review and Applicable Law

We review a trial court=s decision to
limit cross-examination under an abuse of discretion standard. See Matchett
v. State, 941 S.W.2d 922, 940 (Tex. Crim. App. 1996); Ho, 171 S.W.3d
at 304.  An abuse of discretion occurs when the trial court acts without
reference to any guiding rules or principles. Montgomery v. State, 810
S.W.2d 372, 380 (Tex. Crim. App. 1990).








The Confrontation Clause of the United States Constitution
guarantees a defendant the right to cross-examine witnesses.  See U.S.
Const. amend. VI; Delaware v. Van Arsdall, 475 U.S. 673, 678
(1986); Lopez v. State, 18 S.W.3d 220, 222 (Tex. Crim. App. 2000).  A
defendant may cross-examine a witness on any subject Areasonably
calculated to expose a motive, bias or interest for the witness to testify.@ Carroll v.
State, 916 S.W.2d 494, 497 (Tex. Crim. App. 1996).  However, this right is
not without limits. Saglimbeni v. State, 100 S.W.3d 429, 435 (Tex. App.CSan Antonio 2002,
pet. ref=d) (AAlthough the
rights to confrontation and cross-examination are constitutionally protected,
these rights are not absolute.@).  The trial court has considerable
discretion in determining how and when bias may be proved, and what collateral
evidence is material for that purpose. Ho, 171 S.W.3d at 304 (citing Recer
v. State, 821 S.W.2d 715, 717 (Tex. App.CHouston [14th
Dist.] 1991, no pet.)).  To this end, the trial court has the discretion to
limit the scope of cross-examination to avoid harassment, prejudice, confusion
of the issues, endangering the witness, and the injection of cumulative or
collateral evidence. Van Arsdall, 475 U.S. at 679; Ho, 171 S.W.3d
at 304.  This limitation does not violate the defendant=s right to
confront a witness so long as (1) the possible bias and motive of the State=s witness is clear
to the trier of fact; and (2) the accused has otherwise been afforded an
opportunity for a thorough and effective cross-examination. Ho, 171
S.W.3d at 304 (quoting Stults, 23 S.W.3d at 204).

However, the Sixth Amendment should be liberally construed
to give appropriate constitutional protection to the defendant. Saglimbeni,
100 S.W.3d at 435 (citing Chew v. State, 804 S.W.2d 633, 635 (Tex. App.CSan Antonio 1991,
pet. ref=d)).  Accordingly,
the Court of Criminal Appeals has emphasized that the right to
cross-examination Aincludes the right to impeach the witness
with relevant evidence that might reflect bias, interest, prejudice,
inconsistent statements, traits of character affecting credibility, or evidence
that might go to any impairment or disability affecting the witness=s credibility.@ Virts v. State,
739 S.W.2d 25, 29 (Tex. Crim. App. 1987).  Moreover, any question asked of a
witness on cross-examination, which might have a tendency to show the witness= credibility, is
always a proper question. Koehler v. State, 679 S.W.2d 6, 9 (Tex. Crim.
App. 1984).  Thus, the proper scope of cross-examination includes Aall facts and
circumstances which, when tested by human experience, tend to show that a
witness may shade his testimony for the purpose of helping to establish one
side of the cause only.@ Id. (citing Jackson v. State,
482 S.W.2d 864, 868 (Tex. Crim. App. 1972)).

Notwithstanding the trial court=s discretion in
this area, jurors are entitled to have the benefit of the defense theory before
them so that they can make an informed decision regarding the weight to accord
the witness=s testimony, even though they may ultimately reject
the theory.  Maxwell v. State, 48 S.W.3d 196, 199 (Tex. Crim. App. 2001)
(citing Davis v. Alaska, 415 U.S. 308 (1974)).








C.      Application
of the Law to the Facts

1.       Cross-Examination
of Arcos

a.       The Trial
Court Abused its Discretion

We conclude that the trial court=s limitation of
appellant=s cross-examination of Arcos regarding her citizenship
status violated appellant=s confrontation rights, and thus
constitutes an abuse of discretion.  Appellant=s defense theory
was premised, in part, on the citizenship status of Arcos and the timing of the
sexual abuse allegations in relation to a telephone conversation between Arcos
and appellant regarding the subject of divorce in October 2005.  Appellant
sought to question Arcos regarding her citizenship status, in an attempt to
demonstrate to the jury that, since Arcos would presumably face deportation in
the event of divorce, C.S. and J.A. fabricated the sexual abuse charges against
appellant to dissuade him from seeking a divorce.  Appellant attempted to
cross-examine Arcos regarding her citizenship status in the United States, only
to have the trial judge sustain the State=s objection as to
relevance:

[Defense counsel]: Are you a
citizen of the United States?

[Arcos]:                 No sir.

[The State]:            Objection,
relevance.

[The Court]:           Sustained. 
Ma=am, when you hear an objection,
wait to answer the question.  Disregard the question and the answer.

[Defense counsel]: Your Honor, may
I approach the bench, please?

[The Court]:           Yes.

[Defense counsel]: These questions
I=m going to ask about being a
citizen of the United States goes to the weight of my case.

[The Court]:           How so?

* * *








[Defense counsel]: She does not
want a divorce from [appellant] because she=s afraid of going back to Colombia.  This is part of
something that - - the reason we are having some of the problems, also.

[The Court]:           What does
that have to do with whether your client sexually assaulted these girls?

[Defense counsel]: They already
indicated to [appellant] if he divorced or try (sic) to leave their mother,
they were going to do something to hurt him and this is part of it.

* * *

[The Court]:            But what=s it got to do with the girls? 
That=s what I don=t understand, what it has to do
with the case?

[Defense counsel]: When he approached
her in October of 2005 about a divorce is when all this stuff started.  That=s when it all started.

[The Court]:           So you=re saying the girls are lying
because of what?

[Defense counsel]: Because they - -

[The Court]:           Does it have
to do with her citizenship?

[Defense counsel]: They are afraid
their mother is going to get sent back to Colombia if she gets a divorce.

[The Court]:           So by saying
he sexually assaulted them, he is not going to get a divorce now?

[Defense counsel]: You got it.  You
got it on tape, too, Judge.

[The State]:            No, I don=t have it on tape.  I have never
heard that.

[Defense counsel]: He talked with
Officer Barnes about it.

[The State]:            He did say
in the statement to Officer Barnes that I plan on introducing into evidence
that C.S., when she was six, told him if you leave us - -

[The Court]:           When she was
six?

[The State]:            When she
was six, she stated to him that if you leave us, I will call the police and
tell them you touched my middle part.  You can be free and live with us or you
can get a divorce and go to jail.  That=s what essentially he says she said when she was six years
old.  There is nothing about them getting a divorce in October of >05.  There is no divorce filed.  He
hasn=t filed a divorce.








[The Court]:           I=m sustaining the relevance at this
point.  I don=t see it at all.

[Defense counsel]: Note
our exception.  I hope you get it on the record.

Later, on direct examination, appellant attempted to
testify regarding the citizenship status of Arcos, only to have the trial judge
again sustain the State=s objection on relevance grounds:

[Defense counsel]: Now, when you
married Ms. Arcos back in >97, was she a United States citizen?

[The State]:            Objection,
irrelevant.

[The Court]:           Sustained.

[Defense counsel]: I think he can
answer that.

[The Court]:           No, he can=t.  Sustained.

[Defense counsel]: Your Honor, may
I approach the bench?

[The Court]:           No.

[Defense counsel]: May I have the
jury removed?

[The Court]:           No,
sir.








The record reflects that any possible bias and motive of
Arcos to testify, as would have been evinced by testimony regarding her
citizenship status, was not clear to the jury.  Although the trial court
allowed appellant to cross-examine Arcos on the subject of divorce, the trial
court did not allow appellant to inquire into the subject of Arcos=s citizenship
status on either cross-examination or direct examination, nor was any evidence
of Arcos=s citizenship
status otherwise presented during trial.  In fact, by limiting the
cross-examination of Arcos into this subject matter, the trial court denied the
jury the thrust of appellant=s deportation-in-the-event-of-divorce
defense theory, thus depriving the jury of the ability to make an informed
decision regarding the weight to accord Arcos=s testimony, even
though the jury may have ultimately rejected appellant=s theory. Maxwell,
48 S.W.3d at 199.  Therefore, because any possible bias and motive on behalf of
Arcos was not clear to the jury, we find that appellant=s confrontation
rights were violated, and it was an abuse of discretion by the trial court to
limit appellant=s cross-examination of Arcos regarding her
citizenship status.

b.       The Error
Was Harmless

A violation of the Confrontation Clause is subject to a
harmless error analysis.  Shelby v. State, 819 S.W.2d 544, 546 (Tex.
Crim. App. 1991) (citing Van Arsdall, 475 U.S. at 684).  In the context
of improper limitation of cross-examination, the Texas Court of Criminal
Appeals applies the three-pronged test established by the United States Supreme
Court in Delaware v. Van Arsdall. Id. at 547.  First, the
appellate court must assume that the damaging potential of the
cross-examination was fully realized. Id. (citing Van Arsdall,
475 U.S. at 684).  Second, with that assumption in mind, the appellate court
must review the error in connection with the following factors: (1) the
importance of the witness=s testimony in the prosecution=s case; (2)
whether the testimony was cumulative; (3) the presence or absence of evidence
corroborating or contradicting the testimony of the witness on material points;
(4) the extent of cross-examination otherwise permitted; and (5) the overall
strength of the prosecution=s case. Id. (citing Van Arsdall,
475 U.S. at 684).  Finally, in light of the first two prongs, the
appellate court must determine whether the error was harmless beyond a
reasonable doubt. Id. (citing Van Arsdall, 475 U.S. at 684).

Under Shelby/Van Arsdall, we must first
assume that the damaging potential of the cross-examination was fully
realized.  In other words, we must assume the jury was fully informed that
Arcos is not a United States citizen and apply the following five factors:

i.        The
Importance of the Witness=s Testimony in the
Prosecution=s Case








Arcos=s testimony was important, but not
essential, to the prosecution=s case.  She was not the designated
Aoutcry@ witness for the
State.  Moreover, Arcos testified that she never had a direct conversation with
either C.S. or J.A. regarding the substance of their allegations.  Nonetheless,
Arcos provided background information about her relationship with appellant,
and his relationship with her daughters, which corroborated the testimony of
C.S. and J.A.  Furthermore, Arcos and her sister-in-law were the persons who
filed a police report regarding appellant=s sexual abuse,
and were also the persons who took C.S. and J.A. to be interviewed at the CAC,
and her testimony regarding each corroborated that of Barnes and Syon.

ii.       Whether
the Testimony Was Cumulative

Arcos=s testimony was cumulative in some
regards, including her description of the apartment where the sexual abuse
occurred, appellant=s interaction with her daughters, and her
discussion with appellant in October 2005 regarding the prospects for divorce. 
However, her testimony was not cumulative in relation to several facts, namely
her prior marriage to Miguel Arcos, the details of her relationship with
appellant before their marriage, as well as the details of their sexual
relationship during marriage, and her employment history and work schedule.

iii.      The
Presence or Absence of Evidence Corroborating or Contradicting the Testimony of
the Witness on Material Points

On every material issue, Arcos=s testimony was
corroborated by that of C.S., J.A., Syon, and Barnes.  Moreover, her testimony
regarding the October 2005 divorce conversation with appellant was corroborated
by appellant=s testimony on direct examination.

iv.      The
Extent of Cross-Examination Otherwise Permitted

The trial court further prevented appellant from
cross-examining Arcos on the following issues: (1) whether appellant had just
cause to spank his stepdaughters on the occasions when he disciplined them in
that manner; (2) whether C.S. skipped school; and (3) whether appellant=s name was
included on the lease of the new apartment Arcos and her daughters moved into
in 2002.  In each instance, the trial court sustained the State=s objections on
relevance grounds. 








v.       The
Overall Strength of the Prosecution=s Case

Even without Arcos=s testimony, the
prosecution=s case was strong overall, particularly in
light of the testimony of C.S. and J.A., and appellant=s failure to
impeach the complainants= credibility.  See Wheeler v. State,
67 S.W.3d 879, 888 (Tex. Crim. App. 2002) (noting that most sexual abuse
prosecutions hinge on credibility, because the trial is generally a
swearing match between the complainant and the defendant).  The State presented
the testimony of the complainants, who each provided graphic accounts of the
sexual abuse suffered at the hands of appellant; the complainants= mother, who
described the social and sexual isolation that characterized her marriage to
appellant; the police officer who contacted appellant regarding the
complainants= sexual abuse allegations, who recounted that
appellant failed to return her telephone call or otherwise schedule an
interview with her related to those allegations; and the CAC interviewer who
initially questioned the complainants, who testified that, during their
respective interviews, C.S. and J.A. each exhibited behaviors consistent with
child victims of sexual abuse.  In contrast, appellant presented only his own
testimony in his defense, and wholly failed to impeach the credibility of the
most damning prosecution witnessesCthe complainants
themselves.  Furthermore, although appellant does not here complain of factual
sufficiency, it is noteworthy that A>[t]he testimony of
a child victim alone is sufficient to support a conviction for aggravated
sexual assault or indecency with a child.=@ Glockzin v. State, 220 S.W.3d 140,
147 (Tex. App.CWaco 2007, pet. ref=d) (quoting Perez
v. State, 113 S.W.3d 819, 838 (Tex. App.CAustin 2003, pet.
ref=d)).








The final step of the analysis requires us to determine,
in light of the foregoing examination, whether the error was harmless
beyond a reasonable doubt.  Shelby, 819 S.W.2d at 551 (citing Chapman
v. Calif., 386 U.S. 18, 24 (1967)).  Focusing on Arcos=s testimony and
assuming that the jury was fully informed that she is not a United States
citizen, coupled with Arcos=s cumulative testimony regarding
the description of the apartment where the sexual abuse occurred, appellant=s interaction with
her daughters, and her discussion with appellant in October 2005 regarding the
prospects for divorce, and the overall strength of the prosecution=s case even
without Arcos=s testimony, we conclude that the trial court=s denial of
appellant=s right to cross-examination of Arcos, guaranteed by the
Confrontation Clause of the Sixth Amendment, was harmless beyond a reasonable
doubt.  Even if appellant was allowed to cross-examine Arcos on the
subject of Arcos=s citizenship status, and the jury
discovered that Arcos is not a United States citizen, the jury could still
conclude beyond a reasonable doubt that appellant sexually abused C.S. and J.A.
in the manner alleged based on the complainants= testimony alone. 
We therefore overrule appellant=s first issue as it pertains to Arcos.

2.       Cross-Examination
of C.S.

We next consider appellant=s complaint that
the trial court limited his cross-examination of C.S.  The record reflects that
the trial court did not limit this cross-examination.  Instead, during
appellant=s cross-examination of C.S. regarding alleged
discipline problems he had with her, the following exchange occurred:

[Defense counsel]: Did anything
happen in the car when he would take you to school?

[C.S.]:                   There is
one time we argued.

***

[Defense counsel]: Just argued. 
What would y=all argue about?

[C.S.]:                   When I got
older, he thought I was being defiant.  We argued about anything.

[Defense counsel]: Did y=all used to argue about you would
take off and run away from home sometime?

[The State]:            Objection,
relevance.

[The Court]:           Come up to
the bench, please.  That=s sustained.  Approach the bench.

       (At the bench)     If you want to get into
anything you think this girl did --

[Defense counsel]: Ma=am?








[The Court]:           You can=t go into extraneous offenses
regarding this girl without approaching the bench and asking me, especially
regarding sex.  I want to make sure you know the rules of evidence.

[Defense counsel]: Yes, ma=am.  I wasn=t going to ask anything about - - I
was going to ask what were they arguing about as far as her demeanor, ma=am, what caused them to argue. 
That=s what I was trying to get at, why
were they arguing.

[The Court]:           Yeah, but if
it=s about anything that=s going to show her to be a bad
person, I=m not letting it in.  I don=t know what=s coming.

[Defense counsel]: This is part of
some of the things, Your Honor, that is going on.  That=s why he is sitting out there now. 
That=s what some of the problem was in
the home.

[The Court]:           What did they
argue about?

[Defense counsel]: Because she
would take off and stay out at night and everything.  She would run away from
home.  That=s what the whole thing started
about.

***

[The Court]:           I=m going to grant - - I=m not going to let you do that kind
of thing.  If you want to talk about them arguing or he was strict with her and
that=s why she allegedly is making this
up, that=s fine, but I=m not going to let you do this.

[Defense counsel]: This is where I=m getting into, this is one of the
reasons he had to take her to school.  She wouldn=t go to school.

***

[The Court]:           Let me just
hear the allegations that you intend to get out, that=s what you want to get out, and
tell me the relevance of these.








[Defense counsel]: The relevance -
- the question I was asking, the reason I was asking this question, sometime
[appellant] was concerned because he didn=t know whether or not she was going to school all the time,
and that was some of the reasons that he was taking her to school.  And then
further on down than that, because some of this started up is why he and her
mother split up, too, Judge.  This is some of the same questions, because some
of the actions that were being permitted - - being committed by this young
lady.  This is what it all started about.

[The Court]:           Why
he was taking her to school is irrelevant.  I=m not going to
allow any inquiry about that.  I don=t see the
relevance of that at all with regard to these allegations.  Whether they are
split up or not, that=s fine, if you want to get into that. 
What I=m trying to say is
there is a specific rule for prior sexual conduct in here where we have to have
a hearing outside the presence of the jury.

However,
after a short voir dire examination of C.S. regarding a statement made to Syon
during her videotaped interview, the trial judge then allowed cross-examination
of C.S. on this subject:

[The Court]:           All
right.  I=ll allow you to say why did she [sic] take you to
school and not the other girls, and then you can get that out with your client.

Appellant complains here that the effect of the trial court=s ruling was to
prevent him from explaining to the jury the discipline problems he was having
with C.S., which would, in his words, Aexplain that
[C.S.] would be susceptible to making false accusations.@  Contrary to
appellant=s assertion, the trial court allowed appellant to
cross-examine C.S. fully on the subject matter of his taking her to school
following the exchange listed above, as well as on other related discipline
problems.  In fact, the trial court, over the State=s objections,
allowed appellant to cross-examine C.S. on whether she threatened to falsify
charges against appellant in the event that he divorced Arcos, as well as
whether Concepcion ever talked with her about not staying away from home
overnight without telling anyone, namely appellant and Arcos.  Following the
above exchange, the only question not allowed on cross-examination pertaining
to discipline problems was whether C.S. skipped school once in a while, which
the trial judge deemed irrelevant.  Any possible discipline problems existing
between appellant and C.S. with respect to her truancy would have been
disclosed through the line of questioning allowed by the trial court on the
subject of taking C.S. to school.








Furthermore, appellant elicited testimony from C.S. on
cross-examination that (1) she never Aplayed hooky@ from school; (2)
appellant sometimes took her, but not her sisters, to school, even though her
school was closer to the apartment than those of her sisters; (3) on at least
one occasion, she and appellant argued on the way to school; (4) she argued
with appellant about Aanything@ when she got
older; (5) Arcos and Concepcion called the police looking for C.S. when she was
gone overnight without permission; and (6) appellant often spanked C.S. and her
sisters for not following his rules.  The record therefore indicates that the
trial judge did not limit appellant=s
cross-examination of C.S. regarding discipline problems he had with her in the
manner he contends.  Accordingly, we overrule appellant=s first issue as
it pertains to C.S.

II.       Error in
the Jury Charge on Punishment

In his second issue, appellant contends that the trial
court committed error during the punishment phase of the trial when it failed
to, sua sponte, give the jury a reasonable doubt instruction on
extraneous offenses.  As we explain below, we agree; however, we do not find
that the error was harmful.

A.      The Trial
Court Erred

At the punishment phase of trial, the State may introduce
evidence of an extraneous crime or bad act that is shown beyond a reasonable
doubt to have been committed by the defendant. Tex. Code Crim. Proc. art. 37.07, ' 3(a)(1); Huizar
v. State, 12 S.W.3d 479, 480B81 (Tex. Crim.
App. 2000).  Article 37.07 is the law applicable to the case.  See Delgado
v. State, 235 S.W.3d 244, 252 (Tex. Crim. App. 2007); Zarco v. State,
210 S.W.3d 816, 821 (Tex. App.CHouston [14th Dist.] 2006, no pet.).








An extraneous offense is Aany act of
misconduct, whether resulting in prosecution or not, that is not shown in the
charging papers.@ Rankin v. State, 953 S.W.2d 740,
741 (Tex. Crim. App. 1996).  At punishment, a defendant is entitled to have the
jury receive a reasonable doubt instruction regarding extraneous offenses
without request. Huizar, 12 S.W.3d at 484.  Therefore, it is error if
the trial court fails to instruct the jury sua sponte. Zarco, 210
S.W.3d at 821 (citing  Huizar, 12 S.W.3d at 484).  Although a defendant
need not object at trial to preserve error, Huizar, 12 S.W.3d at 484,
the failure to object increases appellant=s burden on
appeal. Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984). 
In this situation, appellant  will obtain a reversal only if he can demonstrate
egregious harm. Id.  Stated differently, when the trial court commits
error, and the defendant fails to object to that error, a reviewing court will
reverse Aonly if the error
is so egregious and created such harm that [the appellant] has not had a fair
and impartial trial.@ Id. (internal quotations omitted).

Here, at punishment, the State reoffered all the evidence
from the guilt/innocence phase of trial, which consisted of the complainants= testimony
regarding both the indicted offenses and extraneous offenses.  With respect to
J.A., the State contends that her testimony does not amount to evidence of
extraneous offenses, as that testimony merely quantified the number of times
appellant committed the acts alleged in the indictment.  With respect to C.S.,
the State does not attempt to refute appellant=s argument that
the trial court erred in omitting a reasonable doubt instruction in the jury
charge on punishment; rather, it contends that the omission did not work
egregious harm, and therefore does not require reversal.  Appellant argues that
the complainants testified about extraneous acts that were not alleged in the
indictments, and the trial court was therefore required to instruct the jury
that they could not consider those acts in assessing punishment unless they
were convinced beyond a reasonable doubt the acts were committed by the
defendant or attributable to him.  We agree with appellant that the indicted
offenses and the extraneous offenses were separate occurrences.

1.       Worley
and Martinez are Distinguishable








Initially, the State claims that J.A.=s testimony does
not amount to evidence of extraneous offenses, as it merely quantified the
number of times appellant committed the acts alleged in the indictment.  It
relies on Worley v. State, 870 S.W.2d 620 (Tex.App.CHouston [1st
Dist.] 1994, pet. ref=d), and Martinez v. State, 190
S.W.3d 254 (Tex. App.CHouston [1st Dist.] 2006, pet. ref=d.), in support of
its argument.[2] 
Those cases are distinguishable.

In Worley, the appellant was convicted of three
counts of aggravated sexual assault of a child and two counts of indecency with
a child by contact. Id. at 621.  The five counts involved four
children; two of these counts involved the same complainant. Id.  At
trial, this complainant testified that the appellant had touched him, Ain any sort of
sexual way,@ Aat least over a hundred times.@ Id.  This
complainant further testified that the appellant had put his mouth on the
complainant=s penis Atwo or three
times.@ Id.  On
appeal, the appellant contended that the complainant=s testimony
constituted evidence of extraneous offenses, and should not have been admitted
into evidence without notice to the accused, as required by Rule 404(b) of the
Texas Rules of Criminal Evidence. Id.

In overruling the appellant=s point of error,
the First Court of Appeals noted that the complainant=s answer, Aover a hundred
times,@ did not describe
an offense, but merely quantified its occurrence. Id. at 622.  The
court noted that the complainant=s testimony was in
response to questions about either fondling or oral-genital contact, both of
which were alleged to have been committed against him in the indictment. Id. 
The court ultimately found that the complainant Anever testified to
any offenses outside the indictment,@ and held that the
complainant=s testimony did not amount to evidence of extraneous
offenses. Id. at 622B23.   The First Court reached the
same result, on slightly different facts, in Martinez. 190 S.W.3d
at 262B63.








Contrary to the State=s assertion, the
present case is controlled by Vernon v. State, 841 S.W.2d 407 (Tex.
Crim. App. 1992).  In that case, the appellant was convicted of aggravated
sexual assault for digital penetration of the complainant=s vagina. Id. at
408.  At trial, the complainant testified that the appellant had committed
several similar, but unalleged, acts of sexual abuse over a number of years,
beginning nearly seven years before the offense on which the appellant had been
indicted. Id. at 410.  The court of appeals held that admission of the
evidence was in the trial court=s discretion, on the ground that the
appellant was engaged in Asome sort of continuing criminal
enterprise,@ so that the extraneous offenses were properly
regarded as Aindividual manifestations of the growing abuse@ of the
complainant. Id.  The court of appeals further held that the unalleged
acts of sexual abuse were not to be considered extraneous offenses, because Athey were part of
the ongoing crime itself,@ Aor because, in any
case, they were res gestae of the crime, tending to illuminate the
unnatural relationship@ between the complainant and the
appellant. Id. (internal quotations omitted).

In reversing the court of appeals, the Texas Court of
Criminal Appeals held that the acts of sexual misconductCboth the indicted
offense and the unalleged offensesCdid not comprise a
single offense under Texas law. Id.  Instead, the Court concluded that
the unalleged offenses were extraneous offenses for purposes of the Texas Rules
of Criminal Evidence, and noted that Athose who commit
multiple discrete assaults against the same victim, are liable for separate
prosecution and punishment for every instance of such criminal misconduct.@ Id. (citations
omitted).  The Court further held that, pursuant to Rule 404(b), evidence of
extraneous offenses is admissible only when relevant to prove an elemental fact
or an evidentiary fact of consequence to determination of the action. Id.
at 411.  The Court reversed and remanded for an evaluation of harm under the then-applicable
Texas Rule of Appellate Procedure 81(b)(2). Id.

2.       C.S. and
J.A. Testified About Acts Not Alleged in the Indictments








Here, appellant was indicted on the offenses of (1)
indecency with a child by contact and (2) aggravated sexual assault of a child
under fourteen years of age.  The charges were alleged in separate indictments:
with respect to J.A., appellant was charged only with the offense of indecency
with a child, Aby touching the genitals of [J.A.] with the intent to
arouse and gratify the sexual desire of [appellant]@; with respect to
C.S., appellant was only charged with the offense of aggravated sexual assault,
Aby placing his
finger in the female sexual organ of [C.S.].@  However, at
trial, both J.A. and C.S. testified about acts of sexual abuse not alleged in
the indictment, namely that appellant had fondled their breasts on more than
one occasion.  Fondling falls within the category of indecency with a child
under Penal Code section 21.11(c). See Tex.
Pen. Code Ann. ' 21.11(c).  Separate instances of fondling
are different offenses under the Penal Code, not merely multiple occasions of
the same offense. Graves v. State, 176 S.W.3d 422, 434 (Tex. App.CHouston [1st
Dist.] 2004, pet. struck).  Penetration is an aggravated sexual assault under
Penal Code section 22.021. Tex. Pen.
Code ' 22.021.

Because the complainants testified about acts that were not
alleged in the indictments, their testimony regarding these acts amounts to
evidence of extraneous offenses.  Vernon, 841 S.W.2d at 410B11.  Therefore,
the trial court was required to give a reasonable doubt instruction at
punishment. Huizar, 12 S.W.3d at 484; Zarco, 210 S.W.3d at 821. 
Its failure to instruct the jury accordingly was error. Huizar, 12
S.W.3d at 484.  We now turn to the harm analysis.

B.      The Error
Was Not Harmful

1.       Egregious
Harm Standard

Deciding whether error occurred is only part of our inquiry;
once error is found, we must determine whether the error harmed appellant. Zarco,
210 S.W.3d at 823.  We will reverse only if the error amounted to egregious
harm. Id. (citing Almanza, 686 S.W.2d at 171; Saunders v.
State, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991)).  We must determine the
impact of the error on a case-by-case basis. Id. (citing Hutch v.
State, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996)).








Egregious harm exists when the defendant=s rights are
injured to the point that he was denied a fair and impartial trial, when the
error (1) went to the very basis of the case; (2) denied the defendant a
valuable right; or (3) vitally affected his defensive theory. Almanza,
686 S.W.2d at 172.  This degree of harm Amust be assayed in
light of the entire jury charge, the state of the evidence, including the
contested issues and weight of probative evidence, the argument of counsel and
any other relevant information revealed by the record of the trial as a whole.@ Id. at
171.  Egregious harm is the highest standard of harm an appellant must meet to
obtain a reversal, in part because it involves error raised for the first time
on appeal. Zarco, 210 S.W.3d at 824 (citing Almanza, 686 S.W.2d
at 172B74).

2.       Application
of the Egregious Harm Standard

In making our determination of whether egregious harm
exists, we will review generally the following at both phases of trial: (1) the
state of the evidence; (2) closing argument and the degree to which the error
may have been emphasized at the punishment phase; (3) the jury charges; and (4)
the punishment ultimately assessed. Id. at 824 (citing Davis
v. State, 28 Tex. App. 542, 13 S.W. 994, 995 (1890); Almanza, 686
S.W.2d at 173B74; Hutch, 922 S.W.2d at 171).  We turn now to
that analysis.

a.       Examination
of the Record

i.        The
Trial Testimony at Guilt/Innocence Supported the Complainants= Claims

The State presented five witnesses, including C.S. and
J.A., who had some knowledge of the sexual abuse and the circumstances
regarding the complainants= disclosure to authorities.

1.       The
Complainants= Testimony About the Sexual Abuse
Was Equally Clear, Equally Direct, Equally Consistent, and Equally Specific in
Detail








At the time of trial, C.S. was sixteen years of age and in
the eleventh grade, and J.A. was fourteen years of age and in the ninth grade. 
Each testified about the charged offenses, as well as the extraneous offenses. 
Their testimony in support of the charged offenses and extraneous offenses was
equally clear, equally direct, equally consistent, and equally specific in
detail.

A.      C.S.=s Testimony

C.S. testified at trial that her relationship with
appellant was very close until approximately 2002, when she turned twelve years
of age.  It was around this time that appellant became more strict and
controlling, and his relationship with C.S. consequently changed.  C.S. further
testified that her relationship with appellant became Amore intimate@ when she was nine
or ten years of age; specifically, it was around this time that appellant began
kissing and touching C.S. differently than he had previously.  C.S. explained
that appellant often kissed her using his tongue, and, on one occasion, commented,
AYour mom would
kill me if she knew we were kissing like this.@  C.S. further
explained that, on more than one occasion, appellant touched her breasts over
her clothing while the two were alone in her bedroom.  However, C.S. could not
quantify the number of times that appellant had touched her in this manner.








With respect to the charged offense, C.S. further related
that, in June 2001, when C.S. was eleven years of age, appellant touched her Ain her vagina@ while the entire
family was watching movies in the living room late at night.  On this occasion,
C.S. and appellant were lying next to one another on the sofa, covered by
blankets, while Arcos, J.A., and her older sisters sat on the floor and another
sofa, respectively.  C.S. testified that appellant reached beneath her
underwear, penetrated her vagina with his finger, and continued to move his
hand until C.S. shifted her weight less than five minutes later, whereupon
appellant  removed his finger and ceased such contact.  According to the
testimony, appellant never again touched C.S. in this manner nor kissed C.S. in
the manner described above following this occasion.  In fact, C.S. testified
that after she had begun having her period, appellant commented that C.S. was Aacting funny with
him,@ and Adidn=t let him touch
[her] or anything.@ C.S. did not inform anyone of this
incident, or of any of appellant=s prior Aintimate@ conduct, until
October 2005.

B.      J.A.=s Testimony

J.A. testified at trial that her relationship with
appellant was Apretty normal@ until 1999, when
she turned seven years of age.  It was around this time that appellant became
more strict, getting mad at his stepdaughters, in J.A.=s words, Aover anything we
did.@  J.A. further
testified that it was also around this time that appellant began touching her
inappropriately.  J.A. explained that, early in the morning, after Arcos left
for work and while J.A. was sleeping, appellant would come over to J.A.=s bed, take her
covers off, and touch her breasts and vagina, at first over her clothes, and
then underneath.  J.A. further explained that appellant=s behavior had
progressed over time:  at first, appellant would only touch her breasts and
vagina over her clothes, but, by the time J.A. was seven-and-one-half years of
age, appellant had started touching both her breasts and her vagina underneath
her clothes.

J.A. further related that appellant never penetrated her
vagina, that he would follow the above-described procedure during each touching
episode, that each episode would last for three to five minutes, that she would
wake up during these episodes, and that appellant continued to touch her in
this manner twice a week for a period of approximately one year, eventually
stopping sometime in 2000.  J.A. testified that she informed C.S. of appellant=s behavior shortly
after it began, but before appellant had begun touching her underneath her
clothes.  J.A. explained that she never again told C.S. of the sexual abuse,
even after appellant had begun touching her underneath her clothes, out of fear
that C.S. would inform Arcos, and that J.A. would get into trouble for the
inappropriate touching.  Other than C.S., J.A. did not inform anyone of
appellant=s inappropriate touching until October 2005.








In sum, the complainants= testimony in
support of the charged offenses and extraneous offenses was equally clear,
equally direct, equally consistent, and equally specific in detail.  C.S.
provided a graphic account of her Aintimate@ relationship with
appellant prior to the charged offense, the details of which form the substance
of appellant=s complaint regarding extraneous offenses.  C.S.
further provided an equally-detailed account of the circumstances surrounding
and the manner in which appellant had penetrated her vagina.  Similarly, J.A.
related the graphic details of the touching episodes she suffered at the hands
of appellantCby her estimate, two touching episodes per week for a
period of approximately one year.  Her testimony in support of the charged
offense and extraneous offenses was identical: the extraneous offenses were
merely separate occurrences of the charged offense; the State merely indicted
appellant on a portion of the conduct occurring in each touching episode.

Although the present appeal does not involve the failure of
the trial judge to honor a defendant=s election
request, we find the following language from the Court of Criminal Appeals
persuasive:

[W]e see no risk that the jury
found appellant guilty of an offense that was not proven to its satisfaction
beyond a reasonable doubt.  The Amultiple offenses@ were all
recounted by the same sourceCthe child.  This case is not concerned
with evidence of different activities from different sources that a jury might
perceive to Aadd up@ to the defendant being guilty even though
no individual offense was proven beyond a reasonable doubt.  Moreover, the
child complainant did not testify about a number of varied incidents with
differing details that might have incrementally added to the idea that the
defendant must have done something to provoke the plethora of stories about his
activities.  Rather, the child articulated one sequence of events and merely
answered that this sequence happened one hundred times, with all but one of
those instances occurring at night.  The child was either credible in giving
this unified account or she was not.  Whether the sequence of events was
alleged to have occurred one, ten, fifty, or one hundred times does not by
itself impact the believability of the child=s story.

Dixon v. State, 201 S.W.3d 731,
735 (Tex. Crim. App. 2006).








2.       The Adult
Testimony in Support of C.S. and J.A. Corroborated the Complainants= Claims, and Was
Consistent with the State=s Theory of the
Case

To complete the story of how the sexual abuse came to the
attention of the complainants= family and eventually the authorities,
the State presented the testimony of: (1) Margarita Arcos, the
complainants= mother; (2) Ivee Syon, a forensic interviewer at the
Children=s Assessment
Center to whom C.S. and J.A. initially disclosed the details of appellant=s sexual abuse;
and (3) Kim Barnes, the police officer who initially contacted appellant
regarding the allegations made against him.

These witnesses each presented clear, direct, and
consistent testimony regarding the complainants= allegations
against appellant. Their testimony corroborated that of the complainants in all
material respects, and was consistent with the State=s overall theory
of the caseCthat appellant was a sexual predator whose abuse of
the complainants increased over time, and that his
deportation-in-the-event-of-divorce defense was fabricated after-the-fact.

Arcos=s testimony relating to her relationship
with appellant presented a picture of appellant that was consistent with the
complainants= allegations of sexual abuse.  She testified that
during their marriage, she and appellant were both socially and sexually
isolated from one another, and that this isolation increased over time. 
Specifically, she testified that appellant Adidn=t really like to
be involved sexually,@ and that the two of them only had sex
three times per yearCon her birthday, on Christmas, and on
Mother=s Day.








Syon=s testimony was further consistent with
the allegations of sexual abuse made by the complainants.  She testified that
while there is no Atypical response@ from a child
victim  of sexual abuse, both C.S. and J.A. exhibited behaviors indicative of
embarrassment and shame, both of which are Aa very strong
dynamic in sexual abuse.@  She explained that during their
respective interviews, the complainants were quiet, uncomfortable talking about
the subject of sexual abuse, shameful, and Ahad very soft
voices.@  Syon further
explained that the complainants exhibited a change in demeanor when the subject
of sexual abuse was broached.  Specifically, Syon testified that C.S. actually
spoke of the guilt and shame in her involvement in appellant=s sexual abuse,
because Ait felt good,@ and Abefore then, she
didn=t know it was
wrong.@  Syon further
testified that J.A. was uncomfortable with the interview, was quick and to the
point, and did not provide much details; in fact, Syon testified that, during
the interview, she had to ask direct questions of J.A., as she was Anot very free in
her narrative.@

Barnes=s testimony concluded the presentation of
the State=s case, and provided some final details as to
appellant=s pre-indictment behavior.  Barnes testified that she
contacted appellant on October 26, 2005, and informed him of the sexual abuse allegations
made against him.  She noted that, upon notifying him of the allegations,
appellant related to her that, when C.S. was seven years old, she told
appellant that Aif he ever left she would call the police
and tell them [appellant] touched her middle part.@  Barnes further
testified that, while such behavior was not per se unusual, appellant
failed to return her telephone call or otherwise schedule an interview with her
related to the allegations.

3.       Appellant
Failed to Impeach the Credibility of any Prosecution Witness, or Otherwise
Substantiate his Deportation-in-the-Event-of-Divorce Defense Theory








Appellant was the sole defense witness called to testify at
trial.  His testimony relating to the sexual abuse allegations consisted of
terse denials of each charge.  Appellant=s attempt to
explain his relationship with Arcos and his regular absences from the family
apartment was equally devoid of detail.  Defense counsel focused the majority
of his efforts, during both direct examination and cross-examination, on
attempting to impeach the credibility of the State=s witnesses,
specifically with regards to Arcos=s citizenship
status and discipline problems with the complainants, particularly C.S. 
However, on direct examination, appellant failed to substantiate or otherwise
explain the crux of his defense theoryCthat he sought a
divorce from Arcos in October 2005, and the sexual abuse allegations were made
shortly thereafter.  Furthermore, on cross-examination of the complainants,
defense counsel failed in his attempt to impeach their credibility; in fact,
the practical effect of defense counsel=s efforts was to
buttress the testimony of the complainants and Arcos.

ii.       Closing
Argument at the Guilt/Innocence Phase Was Uneventful, and the Jury Charge
Properly Limited the Jury=s Consideration of
the Extraneous Offenses

In its closing argument at guilt/innocence, the State did
not urge a finding of guilt based upon an exaggerated version of the testimony
presented at trial.  The record reflects that the State based its entire
closing argument on facts presented in evidence, and logically connected the
testimony of each witness, particularly that of the complainants and of
appellant himself, to the State=s theory of the case.  The jury charge
properly instructed the jurors not to consider evidence of the extraneous
offenses unless they were convinced beyond a reasonable doubt that appellant
committed them:

You are further instructed that if
there is any evidence before you in this case regarding the defendant=s committing other
crimes, wrongs, or acts against the child who is the victim of the alleged
offense in the indictment in this case, you cannot consider such evidence for
any purpose unless you find and believe beyond a reasonable doubt that the
defendant committed such other crimes, wrongs, or acts against the child, if
any, and even then you may only consider the same in determining its bearing on
relevant matters, including: (1) the state of mind of the defendant and the
child; and (2) the previous and subsequent relationship between the defendant
and the child, and for no other purpose.

iii.      At the
Punishment Phase, Both Sides Presented Testimony; the Defense Presented
Testimony Designed to Encourage the Jury to Consider Probation








At the punishment phase, both sides presented testimony. 
The State called C.S. to testify regarding the effects of the sexual abuse on
her life, particularly her interpersonal relationships with friends and her
performance in school.  The defense called two witnesses: appellant and Terrell
J. Owens, pastor of True Love Ministries, the church in which appellant is a
member and a minister.  Appellant testified primarily regarding his service in
the United States Army and his responsibilities in the church; Owens testified
further regarding the latter.  On cross-examination, Owens stated that
appellant is Aa good spirit@ and Aa good man,@ and that, if
appellant was granted probation, Owens would help him successfully complete his
term, and retain him as a minister in the church.

iv.      The
Closing Arguments at Punishment Were Uneventful

At the punishment phase, the closing arguments were equally
uneventful.  The defense focused its attention on probation as the appropriate
form of punishment, and guaranteed the jurors that, if probation were granted,
the trial judge would punish appellant severely for violating any condition
imposed.  In contrast, the State premised its argument on the effects of the
sexual abuse on the complainants= lives, and
further argued that the present case was not an appropriate one for probation,
because (1) appellant denied all responsibility for the charges, thereby
refusing to admit he is a sex offender; (2) the sexual abuse consisted of
repeated acts that appellant enjoyed, in contrast to a single offense for which
he admits guilt, is remorseful, and seeks help; and (3) appellant deserves more
than ten years= imprisonment for the repeated acts of abuse.  In so
doing, the State based a significant part of its closing argument on these
repeated acts of abuse, even approximating that, with respect to J.A.,
appellant committed, by a conservative estimate, one hundred and four acts of
sexual abuse over a one-year period.

v.       The Jury
Charge at Punishment Failed to Contain a Reasonable Doubt Instruction








At the punishment phase, the jury charge failed to contain
a reasonable doubt instruction with respect to the jury=s consideration of
extraneous offenses.  Consequently, the jury was not instructed that it could
not consider evidence of extraneous offenses unless it found beyond a
reasonable doubt that appellant committed them.  Moreover, appellant failed to
object to the trial court=s failure to include an appropriate
instruction in the jury charge.

b.       Harm
Analysis

After having reviewed the trial proceedings, we now
consider whether appellant suffered egregious harm. See Zarco, 210
S.W.3d at 826B27.  Based on our review, we conclude that appellant
was not egregiously harmed by the trial court=s failure to
include a reasonable doubt instruction in the jury charge on punishment.  Even
without this instruction, appellant received a fair and impartial trial.  More
importantly, as we explain below, even if the jury had only considered evidence
of the charged offenses at the punishment phase, the punishment actually
assessed was reasonable and fair, given the severity of the charged offenses
and the age of the complainants.








First, the testimony relating to the extraneous offenses
was introduced at the guilt/innocence phase of trial, where the jury was
properly charged.  Consequently, if the jury considered these offenses at
guilt/innocence, it did so only after finding beyond a reasonable doubt that
appellant committed them. Id. at 826.  At the punishment phase,
the State presented only the testimony of C.S., which related solely to the effects
of appellant=s sexual abuse on her life.[3] 
At the conclusion of C.S.=s testimony, the State merely reoffered
all the evidence from the guilt/innocence phase of trial, and rested.  Notably,
the State did not introduce additional extraneous offense evidence at punishment;
instead, during closing, the State briefly summarized and discussed the
extraneous offense evidence already introduced at guilt/innocence, and urged
the jury to assess the punishment it deemed appropriate.  The fact that the
State discussed this extraneous offense evidence during its closing argument
does not preclude a finding that appellant was not egregiously harmed by the
trial court=s failure to properly instruct the jury at
punishment.  See id. (finding no egregious harm, despite the fact that
the State referred to extraneous offense evidence during its closing argument);
see also Graves v. State, 176 S.W.3d 422,  434B36 (Tex. App.CHouston [1st
Dist.] 2004, pet. struck) (finding no egregious harm, even though the State
referred to extraneous offense evidence at cross-examination during punishment,
and discussed that evidence during its closing argument). Rather, the jury
could properly consider this extraneous offense evidenceCintroduced at
guilt/innocenceCin its assessment of punishment.  See
Duffy v. State, 567 S.W.2d 197, 208 (Tex. Crim. App. 1978) (A[I]n assessing
punishment the jury may consider all the evidence adduced at trial on guilt or
innocence.@); see also Burks v. State, 227 S.W.3d 138, 152
(Tex. App.CHouston [1st Dist.] 2006, pet. ref=d) (A[T]he jury
properly considers guilt-innocence evidence during punishment . . . .@).








Second, with respect to the extraneous offense evidence
introduced at guilt/innocence, the character of the complainants= testimony
regarding the extraneous offenses was identical to the testimony regarding the
charged offenses. Zarco, 210 S.W.3d at 826 (citing Davis, 13 S.W.
at 995 (instructing the appellate court to consider the character of the
testimony to which the omitted charge language applied)).  The complainants= testimony, both
that in support of the charged offenses and that in support of the extraneous
offenses, was reasonable and of such a character that a reasonable mind could
entertain it beyond a reasonable doubt, particularly when considered in
conjunction with the testimony presented by Arcos and Syon. Id. (citing Davis,
13 S.W. at 995 (further instructing the appellate court to determine whether
the character of the testimony was reasonable and presented a theory which a
reasonable mind could entertain when considered in conjunction with the other
testimony in the case)).  C.S.=s testimony regarding the extraneous
offenses was provided with the same level of detail as that in support of the
charged offense.  Similarly, J.A.=s testimony
regarding the charged offense and the extraneous offenses was identical, as
both occurred during the same touching episodes, which were repeated over the
course of one year, and was further consistent with Arcos=s testimony. 
Furthermore, Syon testified that both complainants exhibited behaviors
indicative of embarrassment and shame during their respective interviews, which
is consistent with other child victims of sexual abuse, and further testified
that both complainants experienced a change in demeanor when the subject of
sexual abuse was broached, and not merely when the particular charged offenses
were discussed.  In sum, the complainants= testimony in
support of the extraneous offenses was of the same character and strength as
their testimony in support of the charged offenses, and was of such character
that a reasonable mind could entertain it when considered in conjunction with
the other testimony in the case, including that of appellant himself.








Third, the punishment the jury assessed was at the low end
of the punishment range.  On the indecency charge, the jury could have assessed
punishment at as little as two years or as much as twenty years; on the sexual
assault charge, the jury could have assessed punishment at as little as five
years or as much as life imprisonment.  Instead, the jury assessed punishment
at four years= imprisonment on the indecency charge and ten years= imprisonment on
the sexual assault charge, with no fine, despite the fact that the State sought
a sentence in the range of ten to twenty years on each charge.  This factor
further supports a finding that appellant was not egregiously harmed by the
trial court=s charge error at punishment. See Graves, 176
S.W.3d at 435B36 (finding no egregious harm, in part because the
sentence assessed by the jury was far below the maximum available sentence, and
the State had sought a greater sentence); see also Jones v. State, 111
S.W.3d 600, 609B10 (Tex. App.CDallas 2003, pet.
ref=d) (finding no
egregious harm, in part because the jury assessed punishment far below the
maximum available punishment, despite the State=s plea for the
maximum); Tabor v. State, 88 S.W.3d 783, 788B89 (Tex. App.CTyler 2002, no
pet.) (finding no egregious harm, in part because the sentence imposed was Awell within@ the punishment
range, and the State sought a greater sentence).  More importantly, even if the
jury had only considered evidence of the charged offenses at the punishment
phase, it cannot be said that a four-year and ten-year sentence was not
reasonable and not fair, given the severity of the charged offenses and the age
of the complainants. See Zarco, 210 S.W.3d at 827.

For the foregoing reasons, we conclude that appellant
received a fair trial and that he did not suffer egregious harm by the trial
court=s error in
omitting a reasonable doubt instruction from the jury charge at punishment.  We
therefore overrule his second issue.

Conclusion

We therefore affirm the trial court=s judgment.

 

 

/s/      Wanda
McKee Fowler

Justice

 

 

Judgment rendered
and Memorandum Opinion filed March 4, 2008.

 

Panel consists of
Justices Yates, Fowler and Guzman.

 

Do Not Publish C Tex. R. App. P.
47.2(b).

 









[1]  Although J.A., Arcos, and appellant shared a
bedroom, the record indicates that J.A. slept in a separate bed in this
bedroom.





[2]  The State apparently concedes that C.S. testified to
extraneous offenses at trial, and the trial court erred in not providing a
reasonable doubt instruction in the jury charge at punishment.  However, the
State contends that this error did not work egregious harm on appellant.  As we
explain below, we agree.





[3]   Specifically, C.S. testified that, as a result of the sexual abuse,
she was depressed; her depression was fueled by the sense of guilt she felt Afor what happened between [herself]
and appellant@; she had once contemplated
suicide; she continued to have difficulty trusting others, particularly men;
and she sought professional help from a therapist, whom she regularly saw for a
nine-month period beginning in October 2005.